## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 3:18-cr-0022-2 (VLB)** |
| | : | |
| **TYRESE HARGROVE** | : | |
| **Defendant.** | : | **January 19, 2021** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANT TYRESE HARGROVE'S MOTION FOR A REDUCTION OF SENTENCE, [Dkt. 958]

Before the Court is Defendant Tyrese Hargrove's motion for a sentence reduction to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). [Dkt 958]. Defendant seeks a modification of his sentence from incarceration to home confinement based on his asserted risk of severe complications should he contract COVID-19 while incarcerated at FCI Williamsburg. [*Id.*]. The Government opposes Defendant's motion. [Dkt. 970]. For reasons set forth below, the Court GRANTS Defendant's motion.

### Background

Mr. Hargrove was one of nineteen defendants arrested following an FBI investigation into a crack cocaine trafficking operation in a residential area in New Haven, Connecticut. [Dkt. 373 (Pre-Sentence Investigation Report) ¶¶ 9-10]

("PSR").[1] Mr. Hargrove pled guilty to one count of Conspiracy to Distribute, and to Possess with Intent to Distribute, cocaine base, in violation of 21 U.S.C. §§ 846, 841(a) and (b)(1)(B). [Dkt. 306 (Order adopting Findings and Recommendations of Magistrate Judge Richardson on plea)]. His unlawful activities in furtherance of the conspiracy resulted in an attributed drug quantity corresponding to a guideline calculation of at least 28, but less than 112 grams of cocaine base. [PSR ¶ 4]. Qualifying for a three-level reduction for acceptance of responsibility, Defendant's total offense level was 21. [PSR ¶ 34].

Mr. Hargrove has an extensive criminal history, beginning with a juvenile arrest at age 14. [PSR ¶ 27]. His first adult conviction came at age 17. [PSR ¶ 29]. He was 38 years old at sentencing and had spent 13 years in the custody of the Connecticut Department of Correction for prior convictions. [PSR ¶ 44]; [Dkt. 750 (Sent. Hearing Audio) at 17:00-19:32]. The PSR correctly determined that Mr. Hargrove's past convictions established a criminal history category of VI under the advisory sentencing guidelines, the highest criminal history category under the Guidelines. [PSR ¶ 47]; [Dkt. 759]. Mr. Hargrove also has a significant history of drug abuse, beginning at age 13 and culminating in daily, heavy use of cocaine at the time of his arrest. [PSR ¶¶ 69-74].

Taking all of the 18 U.S.C. § 3553(a) sentencing factors into account and considering the entire record, the Court sentenced Mr. Hargrove to a guideline

---

[1] At sentencing, the Court confirmed that the Defendant read the PSR and the Defendant did not have any objections to the facts as presented in the PSR. [Dkt. 750 (Sent. Hearing Audio) 0:58-1:54]. The Court adopted the PSR as its finding of fact. [Dkt. 759 (Sealed Statement of Reasons) at 1].

sentence of 48 months of imprisonment, with a five-year term of supervised release to follow. [Dkt. 755 (Crim. J.)].

Mr. Hargrove previously moved *pro se* for a reduction of his sentence to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). [Dkt. 831]. The Court denied his pro se motion without prejudice because his motion was not accompanied by any evidence that Defendant had a medical condition that places him at a recognized risk of severe complications should he contract COVID-19. [Dkt. 844].

Several months later, after the pandemic worsened, Defendant's counsel filed a second motion for compassionate release. [Dkt. 958]. Mr. Hargrove argues that his asthma, severe obesity, and pre-diabetes mellitus increases his risk of serious illness if he contracts COVID-19. [*Id.* at 1]. Mr. Hargrove provides a letter from Karen Jubanyik MD, Associate Professor at Yale University School of Medicine, stating that she reviewed Mr. Hargrove's medical records and opines that he has multiple conditions which place him at grave risk from the virus. [Dkt. 958-1 (Jubanyik ltr.)].

The Court has reviewed Mr. Hargrove's medical records, which have been filed under seal. [Dkt. 962 (Sealed Med. R)]. He is now 39 years old. He is severely obese, and his BMI was last measured at 44.48 kg/m². [*Id.* at 19 (May 17, 2020 med. note)]. He gained over fifty pounds while in custody. [*Id.* at 56 (290 lbs. in Feb. 2019, and 283 lbs. in Apr. 2020), 225 (225 lbs. in Feb. 2018)]; *see also* [PSR ¶ 65](275 lbs. during the Dec. 2018 presentence interview). He was prescribed a rescue albuterol

inhaler and a daily corticosteroid inhaler for his chronic asthma. *See* [Dkt. 962 (June 19, 2020 med. note) at 9-10](listing both treatments as active medications). He has pre-diabetes, undergoes diabetic foot examinations, and is prescribed metformin. [*Id.*]; *see also* [*id.* at 24 (May 9, 2020 med note)](noting new diagnosis of prediabetes and prescription for metformin based on high hemoglobin A1C levels). He is also anemic. [*Id.* at 28 (May 9, 2020 med note)].

At the time of sentencing, Mr. Hargrove was in state custody on a parole violation stemming from the same conduct as the instant offense, beginning in February 2018. The Court recommended that the Federal Bureau of Prisons ("BOP") credit Mr. Hargrove's time served in state custody towards the calculation of his federal sentence. [Dkt. 755 (Crim. J) at 2]. Defendant received state parole on June 26, 2020, but was not physically transferred to federal custody until October 2020 because of pandemic-related restrictions on prisoner transports. [Dkt. 958 (Def. Mem. in Supp.) at 2]. Defendant was initially designated to FCI Schuylkill. [*Id.*].

On August 25, 2020, Mr. Hargrove, through counsel, filed a request with the warden of FCI Schuylkill that the BOP move for compassionate release on his behalf based on his health risk attendant to the pandemic. [*Id.*]; See [Dkt. 958-2, Def. Ex. C](memorializing earlier correspondence). The warden's executive assistant responded, indicating that Mr. Hargrove should make the request once he is physically at FCI Schuylkill. [Dkt. 958 (Def. Mem in Supp.) at 2]. Defendant's counsel then sought relief from the counsel for the BOP's Northeast Regional Office, but the BOP's counsel never responded. [*Id.* at 3]; *see also* [Dkt. 958-2, Def. Ex. B]. Thereafter, Defendant's counsel renewed his request to the warden of FCI

4

Schuylkill on October 5, 2020. [Dkt. 958 (Def. Mem. in Supp.) at 3]; *see also* [Dkt. 958-2, Def. Ex. C]. Warden Scott Finley denied Defendant's request in a letter dated October 27, 2020. [Dkt. 958-2, Def. Ex. D.].

The following month, Mr. Hargrove was transferred to the Federal Transfer Center in Oklahoma City, then to USP Atlanta on December 10, 2020. [Dkt. 958 (Def. Mem. in Supp) at 4]. Later that week, Defendant's counsel wrote to the warden of USP Atlanta, requesting that the BOP move for compassionate release on Mr. Hargrove's behalf. [*Id.*]; *see also* [Dkt. 958-2, Def. Ex. E.]. Defendant's counsel was then informed that Defendant was being transferred to FCI Williamsburg. [Dkt. 928 (Def. Mem. in Supp.) at 4].

A review of the Bureau of Prison's ("BOP") Inmate Locator confirms that Mr. Hargrove is now designated to FCI Williamsburg. *See Inmate Locator Service, BOP Registration no. 25756-014*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/, (Jan. 14, 2021). According to the BOP's Inmate Locator Service, his current release date is July 4, 2021. *Id.* Contrary to BOP's Inmate Locator, Defendant's supplemental brief explains that Mr. Hargrove physically remains at USP Atlanta because transportation between BOP facilities was halted. [Dkt. 965 (Def. Suppl. Mem.) at 1-2]. When defense counsel asked staff at FCI Williamsburg whether Mr. Hargrove was to be held at the medium-security facility or the camp, the information could not be located in the facility's computer system. [*Id.* at 2]. Defense counsel's historic efforts to communicate with staff at the Federal Transfer Center and USP Atlanta have not been particularly fruitful: he

made "20 calls on 10 separate days to [USP Atlanta], all but two calls went to hold and then were disconnected." [Dkt. 958 (Def. Mem. in Supp.) at 11, n. 22-23].

Mr. Hargrove requests release to home confinement for his custodial sentence. [Dkt. 958 (Def. Mem. in Supp.) at 11-12]. He proposes to reside, subject to the terms of home confinement, with his wife, his three stepchildren, and his sister-in-law in their single-family home in New Haven, Connecticut. [*Id.*]. He proposes electronic monitoring, random drug testing, participation in drug counseling, and, if and when possible, Support Court. [*Id.* at 12]. If released, Mr. Hargrove's wife would drive to FCI Williamsburg and drive them to their home in New Haven. [Dkt. 965 (Def. Suppl. Mem.) at 3]. Mrs. Hargrove is a health care worker and is tested for COVID-19 twice per week. [*Id.*]. She intends to take leave from work and would be tested before she returns to work. [*Id.*]. Mr. Hargrove requests the Court to "direct the BOP to test Mr. Hargrove and condition his release on a negative test." [*Id.*].

The Court ordered the Government to address when the BOP anticipates commencing COVID-19 vaccinations for inmates and the order of priority once vaccinations commence. [Dkt. 961]. The Government filed a copy of the BOP's COVID-19 vaccine distribution plan, which includes the prioritization policies and technical guidance on vaccine administration. [Dkt. 970-1], *COVID-19 Vaccine Guidance*, Fed. Bureau of Prisons, (Version 7.0, Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. According to the guidance document, BOP employees will be vaccinated before inmates in order to reduce the likelihood of introducing the virus to a facility. *Id.* at 5. After all BOP

6

employees at that institution are offered the vaccine, inmates will be offered the vaccine by priority level. *Id.* Mr. Hargrove should be in the second inmate priority group, which includes those inmates aged 65 years and older or those of any age meeting one or more of the U.S. Centers for Disease Control and Prevention's ("CDC") criteria for medical conditions that predispose a person to an increased risk of severe illness, which includes severe obesity (BMI >40 kg/m$^2$). *Id.* at 6. Neither the Government nor the BOP clinical guidance document predicts when inmates within the different priority levels and at different correctional institutions will receive vaccinations. Based on current available data from the CDC, the BOP has distributed 16,685 doses of the vaccine, consisting primarily of the first dose of the two-dose series. *COVID-19 Vaccinations in the United States*, Ctrs. for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (table last updated Jan. 15, 2021).

## Legal Standard

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed'; but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (citations omitted) (quoting 18 U.S.C. § 3582(c)). The statute codifying the rule of finality states:

> [T]he court ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment),

7

after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The specific provision under which Defendant seeks relief from his sentence, the First Step Act of 2018 (as amended), imposes procedural prerequisites to filing a motion for resentencing to provide compassionate release. First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)). Previously, only the Bureau of Prisons ("BOP") could move for compassionate release and such motions were rarely filed. *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020). The First Step Act amendments were intended to address past inaction by the BOP by removing the BOP as the sole arbiter of compassionate release, while still permitting the BOP to weigh-in on a defendant's request via the statute's exhaustion of administrative remedies requirement. See *id.* at 232; *see also United States v. Gamble*, No. 3:18-CR-0022-4(VLB), 2020 WL 1955338, at *3 (D. Conn. Apr. 23, 2020)(explaining the policy purpose behind the exhaustion requirement in this context).

Recently, in *Brooker*, the Second Circuit held that since the BOP no longer has exclusive authority to bring a motion for compassionate release, district courts have the discretion to determine what constitutes "extraordinary and compelling" circumstances outside of the outdated U.S. Sentencing Commission policy statements when the defendant moves for compassionate release. 976 F. 3d at 234-36. In short, the statute only requires courts to consider "applicable" statements

issued by the U.S. Sentencing Commission and the relevant policy statement, U.S.S.G. § 1B1.13, is no longer "applicable" because the policy statement refers exclusively to a motion brought by the Director of the BOP. *Id.* at 235-36. In other words, "[w]hen the BOP fails to act, Congress made the courts the decision maker as to compassionate release." *Id.* at 236. Therefore, courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release," and not just those delineated by the U.S. Sentencing Commission's policy statement. *Id.* at 237.

Consequently, the Court may grant a Defendant's motion for compassionate release if: (1) the Defendant has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the Warden, and (2) the Court finds that, after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

The defendant bears the burden of proving that he is entitled to a sentence reduction. *United States v. Gagne*, 451 F. Supp. 3d 230, 234 (D. Conn. 2020). The district courts have broad discretion in deciding whether to grant or deny a motion for compassionate release. *United States v. Gileno*, 448 F. Supp. 3d 183, 186 (D. Conn. 2020); *see also* § 3582(c)(1)(A) ("[T]he court…may reduce the term of imprisonment...").

### A. Whether Mr. Hargrove exhausted administrative remedies

Pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant must either "…fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to

bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." (emphasis added). Thus, a defendant need not exhaust all available administrative appeals of the warden's denial of the request, so long as defendant waits thirty days before seeking judicial relief.

Here, the parties and the Court agree that Defendant exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A). [See 970 (Gov. Mem. in Opp'n) at 11]. Mr. Hargrove established that he first requested that the BOP move for compassionate release on his behalf on multiple occasions and he has waited over 30 days before unilaterally seeking judicial relief. [Dkt. 958-2 (Def. Exs. B-E)]. The BOP has had the opportunity to review the factual basis for Defendant's requested sentence reduction, which is now properly before the Court.

B. Whether "extraordinary and compelling reasons" exist to warrant a sentence reduction.

Section 3582(c)(1)(A) does not define what constitutes "extraordinary and compelling reasons" and, under *Brooker*, district courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." 976 F.3d at 237. Mr. Hargrove argues that his preexisting medical conditions, to wit, severe obesity with a BMI of 44 kg/m², asthma, and pre-diabetes place him at a medically recognized heightened risk of severe complications or death if he contracts COVID-19. [Dkt 958 (Def. Mem. in Supp.) at 9](quoting letter from Dr. Jubanyik). The Government concedes that Mr. Hargrove' severe obesity places him at risk of serious

complications or death from the virus, which constitutes a sufficient basis for the Court to find "extraordinary and compelling reasons" to modify his sentence. [Dkt. 970 (Gov. Mem. in Supp.) at 12-13].

This Court and others have recognized that the prevention of infection from COVID-19 may constitute "extraordinary and compelling" reasons to grant compassionate release where the defendant has a medical condition recognized by the CDC to heightened the risk of developing severe complications from COVID-19, often in combination with other factors. *See, e.g. United States v. Jepsen*, 451 F. Supp. 3d 242, 245-47 (D. Conn. 2020) (granting motion for compassionate release where defendant suffers from a compromised immune system and defendant had less than eight weeks remaining on sentence); *United States v. Miller*, No. 3:15-CR-132-2 (VLB), 2020 WL 3187348, at *5 (D. Conn. June 15, 2020)(granting motion for compassionate release for severely ill defendant with less than three months remaining on sentence).

Courts considering defendants' medical vulnerability from COVID-19 ordinarily look to the CDC's guidance on at-risk health populations. *See United States v. Rivera*, 466 F. Supp. 3d 310, 315 (D. Conn. 2020); *see also, United States v. Adams*, No. 3:16-CR-86-VLB, 2020 WL 3026458, at *2 (D. Conn. June 4, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020). In determining whether a defendant's medical vulnerability to the virus constitutes "extraordinary and compelling" reasons for re-sentencing, courts have considered a multitude of factors in factually intensive inquiries, including: defendants' age, the severity and documented history of their health

11

conditions, defendants' history of managing those conditions in prison, the proliferation and status of infection at defendants' facilities, and the proportion of the term of incarceration that has been served. *United States v. Brady*, No. S2 18 CR. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020)(citations omitted).

For the last several months, the CDC has classified underlying health conditions that correlate to an increased risk of severe complications from contracting COVID-19 into two categories; conditions that are known to cause an increased risk of severe illness and those that might increase a person's risk. *People with certain medical conditions*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 29, 2020). The conditions listed are regularly updated as the CDC reviews new scientific research. *Id*.

Severe obesity, defined as having a BMI greater than 40 kg/m$^2$, is among the conditions that the CDC recognizes as increasing a person's risk of severe illness from coronavirus. *Id*. The custodial medical records readily establish that Mr. Hargrove is severely obese, with a BMI last measured at 44 kg/m$^2$. [Dkt. 962 (Sealed Med R.) at 19]. The Court considers this factor in light of Mr. Hargrove's overall health, age, and conditions at his place of incarceration. *Compare to United States v. Newton*, No. 3:18-CR-0022-8(VLB), 2020 WL 6784267, at *5-6 (D. Conn. Nov. 18, 2020)(26-year-old defendant's marginal obesity and well controlled asthma did not constitute "extraordinary and compelling" reasons for release in light of his overall health, age, and conditions at his place of incarceration) and *United States v. Henderson*, No. 3:19-CR-00030(VLB), 2020 WL 7321403, at *5-6 (D. Conn. Dec. 11,

2020)(declining to find "extraordinary and compelling" reasons for release of 26-year-old defendant based on confirmed diagnosis of asthma and assertion that defendant is obese based on counsel's calculation of BMI).

The medical records suggest that, notwithstanding the fact that Mr. Hargrove is 39 years old, his overall health has declined while in custody. He has gained and lost weight; and on balance gained a significant amount of weight. While his medical records do not explicitly state he has been diagnosed with Type 2 diabetes, he undergoes diabetic foot examinations and is prescribed metformin, an important medication for the treatment of Type 2 diabetes. *See generally Metformin*, U.S. Nat'l Lib. of Med.: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a696005.html (last visited Jan. 15, 2021). Consequently, the Court finds the fact that he is being monitored and treated for diabetes means he has the vulnerability to COVID-19 that a person diagnosed with the condition would have.

Mr. Hargrove's diagnosed asthma is treated with both an albuterol rescue inhaler and a daily corticosteroid inhaler, both of which may be additional risk factors for severe illness if Mr. Hargrove were to contract the virus. See *People with certain medical conditions*, Ctrs. for Disease Control and Prevention (recognizing that adults of any age with moderate to severe asthma or an immunocompromised state, including use of corticosteroids or use of other immune weakening medicines, might be at a heightened risk for severe illness).

13

The Defendant is approaching middle age, which, statistically bears an increased likelihood of hospitalization and death as compared to adults age 18-29. *COVID-19 Hospitalization and Death by Age, Ctrs. for Disease Control and Prevention*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated Aug. 18, 2020)(adults age 30-39 are twice as likely to require hospitalization and four times as likely to die from the virus compared to younger adults). Here, based on the CDC's guidance and a careful review of Mr. Hargrove's medical records, the Court finds that he is more vulnerable to severe complications or death if he contracts COVID-19.

The virus is present at his current place of imprisonment, USP Atlanta, and the prison where the BOP plans to transfer him, FCI Williamsburg. At USP Atlanta, 30 inmates are currently positive for the virus, one inmate died, and 84 have recovered. *BOP COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp (table last updated Jan. 16, 2021). At FCI Williamsburg, 30 inmates are currently positive for the virus, one inmate died, and 100 have recovered. While both prisons are large, the active and historic infection rate is significant and above the State of Connecticut as a whole. See *Population Statistics*, Fed. Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp (table last updated Jan. 7, 2021); *see also US COVID-19 Average Daily Case Rate in Last 7 Days, by State/Territory (cases per 100K)*, Ctrs. for Disease Control and Prevention https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last updated Jan. 18, 2021). Thus, considering the Defendants' specific circumstances,

14

the prevalence of the virus at the facilities where he is to be incarcerated weighs in favor of finding extraordinary and compelling circumstances.

The final issues for the Court to consider in determining whether extraordinary and compelling reasons exist for a sentence reduction is the availability of a vaccine and the proportion of the Defendant's sentence already served.

Two highly effective vaccines against the coronavirus are now approved for emergency use. *COVID-19 Vaccine Guidance*, Fed. Bureau of Prisons. Vaccination from the virus would undercut the argument that release to home confinement to prevent him from contracting the virus constitutes "extraordinary and compelling" reasons to modify his sentence. Prioritization of inmates and other persons living in congregate settings means that an imprisoned defendant may receive a vaccine before they otherwise would receive the vaccine if released. Based on the BOP vaccination guidance filed by the Government, it is unlikely that he will receive a vaccine from the BOP if the Court releases him to home confinement:

> Inmates admitted to quarantine with mandatory release/transfer dates (e.g., full term releases or court-ordered transfers) may be considered for vaccination on a case-by-case basis. In situations where there is time to complete the multi-dose vaccine series prior to the inmate's departure, vaccination may proceed. However, if there is insufficient time to complete all doses, the COVID-19 vaccine series should not be started with the first dose unless continuity of care for the second dose can be assured at the receiving location (e.g., community or other correctional jurisdiction).

*Id.* at 6

The BOP has not indicated when vaccination of inmates will commence, and the Court cannot predict when Mr. Hargrove could receive both vaccinations. Given

the uncertainty, the potential availability of the vaccine does not undercut Mr. Hargrove's argument that "extraordinary and compelling" reasons exist to warrant his release now.

Finally, and significantly, the limited duration remaining on Defendant's sentence is another consideration favorable to his motion for release. *See, e.g. Rivera*, 466 F. Supp. 3d at 317 (D. Conn. 2020)(granting compassionate release where defendant served 90% of his custodial sentence); *Jepsen*, 451 F. Supp. 3d at 246 (D. Conn. 2020)(granting compassionate release where immunocompromised defendant had eight weeks remaining on a nine month sentence); *but see Henderson*, 2020 WL 7321403, at *7 (denying compassionate release for a defendant who, although nearing the conclusion of his sentence, committed a serious disciplinary infraction the day after he requested that the warden move for compassionate release on his behalf).

Mr. Hargrove has served over 43 months of the 48-months of imprisonment that the Court imposed. Mr. Hargrove received his last disciplinary ticket before his arrest for the instant offense, meaning that he has served his current sentence discipline-free. [Dkt. 958-3 (Conn. Dept. of Correction Disciplinary Records) at 6].

Accordingly, the Court finds that the combination of Mr. Hargrove's recognized medical vulnerability to COVID-19, the proliferation of the virus at his facility and the facility where he is about to be transferred, the absence of any prediction as to when he may receive the vaccine, and the fact that he has served

most of his sentence, and has done so without any disciplinary issues, constitute "extraordinary and compelling" reasons for a reduction in sentence.

The next step in the analysis is consideration of the purposes of sentencing as set forth in § 3553(a) before determining whether a reduction of his sentence is warranted.

### C. Whether a reduction of Mr. Hargrove's sentence is warranted after considering the § 3553(a) sentencing factors

Although the Government concedes that Mr. Hargrove exhausted his administrative remedies and that his medical vulnerability to severe complications from the virus constitutes an "extraordinary and compelling" reason sufficient to reduce his sentence, it argues that Mr. Hargrove is a danger to the community under U.S.S.G. § 1B1.13(2) and a reduction of his sentence would be inconsistent with the purposes of sentencing. [Dkt. 970 at 13-14].

Before considering the balance of the § 3553(a) sentencing factors, it bears mentioning that the requirement that the Court determine that "…(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" is not a separate dimension of analysis for compassionate release motions if the motion is brought by the Defendant, rather than the BOP. The requirement for the Court to evaluate dangerousness is contained in the U.S. Sentencing Commission's policy statement, not the First Step Act, as amended. *See Brooker*, 976 F.3d at 231-32. Nevertheless, the arguments raised by the Government as to Mr. Hargrove's dangerousness are relevant for considering "the nature and circumstances of the offense and the history and characteristics of the

17

defendant," § 3553(a)(1), and "to protect the public from further crimes of the defendant[,]" § 3553(a)(2)(c).

The Government argues that Mr. Hargrove has 15 prior convictions, including a prior conviction for assault, a prior conviction for escape from custody, three prior firearms convictions, and three prior drug-trafficking convictions. PSR ¶¶ 29-43. Mr. Hargrove also received several disciplinary tickets while serving prior state sentences.  [Dkt. 970 (Gov. Mem. in Opp'n) at 14]. Mr. Hargrove engaged in the instant offense while on state parole for firearms and drug offenses. [PSR ¶¶ 43, 46]. The Government argues that "[p]lainly put, Hargrove is in jail now because he is a repeat offender who is a danger to the community, and because he has been an undeterred danger to the community since 1999, when he was first convicted of a drug-trafficking offense." [Dkt. 970 at 14].

In reply, Mr. Hargrove argues that his conditions of confinement are particularly harsh while subject to COVID-19 quarantine, which he acknowledges is for inmate and staff safety. [Dkt. 971 (Def. Repl. Br.) at 1-2]. Defendant's brief states that "quarantined inmates [are] confined to their cells 24 hours a day, four days a week and permitted to leave their cells for only two to three hours a day, three days a week." [*Id.*]. Mr. Hargrove has been continually quarantined since leaving FCI Schuylkill because the BOP continued to transfer him. [*Id.*]

The Defendant argues that the Government's argument about his criminal history and dangerousness would have greater force if he was further from his release date. [*Id.* at 2]. In particular, Mr. Hargrove's counselor advised defense

counsel that Defendant may be released to a half-way house within 90-days of his scheduled release date, at which time he would have more liberty than under his proposed conditions of house arrest. [*Id.* at 2].

The Court agrees with the Government that Defendant's criminal history is troubling. However, the Court cannot conclude that the purpose of sentencing would be fulfilled by imprisoning Mr. Hargrove for the few months remaining on his sentence under current pandemic conditions and considering the serious risk to his health. The Court concludes that, given the circumstances presented in this case, 43 months of imprisonment is a just punishment for the offense and reflects the seriousness of the offense. The Court also finds that recidivism is less likely because Defendant's risk of infection during the pandemic requires him to limit the scope of his interactions with others. Defendant is older now and the custodial sentence, particularly under quarantine conditions while in federal custody, is more likely to have a deterrent effect. Additionally, he will be on supervised release and the Court would be disinclined towards leniency should he prove the Court's faith in him was misplaced by violating a condition of release.

Finally, at sentencing, the Court recognized that Mr. Hargrove had a serious and previously unmet need for drug rehabilitation and recommended him for the BOP's RDAP program. [Dkt. 755 (Crim. J)]. Almost all of the time Defendant spent in federal custody has been under quarantine conditions, with limited rehabilitative programing. The Court cannot conceive of any rehabilitative value the five remaining months of imprisonment would provide Mr. Hargrove.

19

Mr. Hargrove's potentially still untreated drug addiction, long history of recidivism, and prior convictions for offenses showing both disrespect for the law and a proclivity for firearms gives the Court great pause. However, Mr. Hargrove is not receiving substance abuse or cognitive behavioral therapy while in custody and thus these rehabilitative purposes of sentencing are not being fulfilled. Mr. Hargrove would benefit more from release and participation in Support Court and therapy in the community than a few more months of warehousing in prison.

Notably, Mr. Hargrove was able to maintain employment when he was sober. [PSR ¶ 81]. He was also married shortly before his incarceration and his wife has demonstrated a commitment to supporting him, as evidence by her involvement in planning for his potential release. [PSR ¶¶ 60-92]; [Dkt. 965 (Def. Suppl. Mem.) at 3]. This positive support system, coupled with electronic location monitoring, and drug and therapeutic treatment reinforced by random drug screenings, are sufficient to protect the public during the short period that Mr. Hargrove would have otherwise been imprisoned.

In conclusion, after considering "the factors set forth in section 3553(a) to the extent that they are applicable," the Court finds that "extraordinary and compelling" circumstances warrant a reduction of Defendant's sentence to release him to home confinement.

## Conclusion

For the aforementioned reasons, the Court GRANTS Defendant's motion for a reduction of his sentence to provide compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

That provision provides that the Court "…may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." (parenthetical omitted). In accordance with this provision, the Court imposes a term of supervised release commencing from his release from BOP custody through his previously scheduled discharge date, July 4, 2021, at which point the Defendant will begin his five year-term of supervised release imposed at sentencing.

The Court imposes the mandatory, the standard, and special conditions of supervised release pronounced at sentencing for this additional term of supervised release. In addition, Defendant shall observe Support Court in New Haven weekly starting the second Wednesday following his release and consider applying to become a Support Court participant. Considering Mr. Hargrove's criminal history, the Court will impose electronic location monitoring as an additional condition of release to run through July 4, 2021. The Defendant will be permitted to leave the premises for medical appointments, including drug rehabilitation, if he informs and gets prior approval from his supervising Probation Officer no later than 72 hours before the scheduled appointment.

Mr. Hargrove shall be released by the BOP to the custody of his wife, Lacey Bland Hargrove. Mrs. Hargrove will transport him to Connecticut. Upon Mr.

Hargrove's arrival in Connecticut, he shall immediately contact the U.S. Probation Office to inform his supervising probation officer of his arrival and to make arrangements to install the electronic monitoring device deemed appropriate by the supervising Probation Officer. Defense counsel shall undertake all reasonable efforts to facilitate communication between Defendant, Mrs. Hargrove, the U.S. Probation Office, Support Court and the BOP.

The Court declines to order the BOP to test Mr. Hargrove for COVID-19 as a condition of release. The Defendant cites no authority for the Court to enter such an order. The Court *strongly* recommends that the BOP test Mr. Hargrove prior to releasing him to his wife's custody in order to assure her safety and the safety of the public.

Finally, two words of caution. First, the reduction of Defendant's sentence from a period of incarceration to home confinement is intended to mitigate against the potentially catastrophic health consequences should he contract COVID-19. The Court will not entertain motions to modify his conditions of supervised release. Second, Mr. Hargrove should note that the leniency shown by the Court at sentencing and again in consideration of his motion for compassionate release is unlikely to be shown a third time if he betrays the Court's trust by violating any term of supervised release, irrespective of its severity or any asserted health risks attendant to incarceration.

Lastly, the Defendant's motion expressed an interest in applying for Support Court. The Court encourages Mr. Hargrove to apply as it would reinforce his avowed desire to rehabilitate himself.

An amended criminal judgment will enter.

IT IS SO ORDERED

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut this January 19, 2021